IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

JACQUELYN A. DEARMORE                                        PLAINTIFF

     v.                          Case No. 4:20-cv-188-KGB

CINDY GILLESPIE et al., in their
official and individual capacities                          DEFENDANTS

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

This brief supports Ms. Dearmore's motion for a temporary restraining order and

preliminary injunction on the *official capacity* claims for injunctive relief that the Defendants

violated her right to due process by reducing her benefits despite her timely requests for appeal

and continuing benefits and by providing her deficient notice. The facts in this brief come from

Ms. Dearmore's declaration, the exhibits attached to her declaration, and ADHS's written

policies and procedures, of which the Court can take judicial notice. *See* Fed. R. Evid. 201.

**Ms. Dearmore's Facts**

Ms. Dearmore is a former school teacher, florist and flower shop owner, and literacy

instructor. Dearmore Declaration, ¶ 2. Since 2012, she has chronic myeloid leukemia, a form of

cancer that persists to present. *Id.*, ¶ 3. Treatment for this form of leukemia involves medication

that causes her to vomit, lose hair, and gain significant weight. *Id.* She has multiple medical

conditions in addition to leukemia, including chronic pain in her back and hips due to

deteriorating discs and bone spurs, neuropathy in her arms and legs, osteoarthritis, osteoporosis,

chronic urinary incontinence, bipolar disorder, and anxiety disorder. *Id.*, ¶ 4. She had her left hip

replaced in 2016 and is being evaluated for right hip replacement surgery. *Id*. Due to these

conditions, she needs help with almost every aspect of daily life, including getting from one

place to another, getting in and out of chairs, getting on and off the toilet, cleaning herself fully after using the toilet, showering, doing her daily grooming, cleaning the house, preparing meals, doing shopping, doing laundry, and going to medical appointments. *Id.*, ¶ 5.

In 2012, she applied for and was determined eligible for the Alternatives for Adults with Physical Disabilities Medicaid program. *Id.*, ¶ 6. Every year since then, ADHS has assessed her and determined her eligible for the same program, which is now called ARChoices. *Id.* Prior to to November 8, 2019, DHS authorized her to receive 143 hours per month of care, seven home-delivered meals per week, and a personal emergency response system. *Id.*, ¶ 7 (2017 service plan included as Exhibit 1 to the declaration). She had been receiving 143 hours per month of attendant care since at least August 2017 and has used the Area Agency on Aging for Northwest Arkansas as her caregiving agency since December 2017. *Id.*

On November 8, 2019, DHS mailed Ms. Dearmore a Notice of Action and an ARChoices Person-Centered Service Plan authorizing her to receive only 103 hours per month of care and a Task and Hour Standards spreadsheet. *Id.*, ¶ 8 (2019 service plan included as Exhibit 2 to the declaration). The service plan expires on July 1, 2020. *Id.* The notice and other papers do not provide any specific reasons for the cuts. *Id.*, ¶ 9. Her health conditions and ability to care for herself have not only gotten worse between between 2017 and present. *Id.*, ¶ 10.

On November 15, 2019, Ms. Dearmore completed an appeal form to contest ADHS's decision to reduce her care hours. *Id.*, ¶ 11 (appeal form included as Exhibit 3 to the declaration). She checked a box marked "I want to continue getting medical assistance until the hearing." *Id.* Her case manager at the Area Agency of Aging emailed the form to DHS on the same day. *Id.*

Starting December 1, 2019, her care was cut to only 103 hours per month. *Id.*, ¶ 12. Because of the reduced care hours, her aides do not have enough time to meet her care needs.

She skips about one meal every day, lies in urine-soaked pads or clothing for periods several hours longer than before, takes a shower only every other day instead of every day, uses dirty towels or clothes because her laundry cannot get done, and lives in a dirty house because she sometimes leave urine trails around the house. *Id.*, ¶ 13. She has given up going outside of her house and has more skin problems from not being cleaned enough, including in her genital area. *Id.* She also has had to miss at least four medical appointments—including with her oncologist, cardiologist, psychiatrist, and ophthalmologist—because she does not have enough care hours for her care aide to accompany her to appointments, and she cannot get other transportation without her aide. *Id.*, ¶ 14. She has had to miss diagnostic procedures and medical treatment. *Id.* Since the cuts, she has stronger symptoms of depression and spends much more time crying *Id.*, ¶ 15. She does not have any family or friends available to provide additional care. *Id.*, ¶ 16.

A date for her administrative hearing is now pending. *Id.*, ¶ 17. Optum, a DHS contractor, called her to set up a new assessment on March 18 for unknown reasons. *Id.*, ¶ 18.

## Overview of ARChoices and Predecessor Programs

Medicaid is a medical assistance program for individuals with limited economic resources created pursuant to federal statute and subject to federal oversight. *See generally* 42 U.S.C. § 1396. The program was "designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services." *Atkins v. Rivera*, 477 U.S. 154, 156 (1986). It was created in 1965 as Title XIX of the Social Security Act. Pub. L. No. 89-97 (codified as amended at 42 U.S.C. § 1396 *et seq.*). State governments work in partnership with the Centers for Medicare and Medicaid Services (CMS), a part of the Department of Health and Human Services (HHS), to administer Medicaid. The state and federal governments share responsibility for funding Medicaid. States administer the program subject to

federal requirements imposed by the Medicaid Act, HHS regulations, and policy directives. Though participation is voluntary, states that elect to accept federal Medicaid funds must comply with requirements imposed by federal law. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2581 (2012); *Atkins*, 477 U.S. at 157. Arkansas, like all other states, has elected to participate in Medicaid and has designated ADHS to be the "single State agency" to administer the program. *See* Ark. Code Ann. § 20-77-107; 42 U.S.C. § 1396a(a)(5).

If a state opts to participate, the state must create a "State Plan for medical assistance," approved by HHS, which identifies the scope of the state's program and assures that it will be administered in conformity with the requirements of federal law. 42 U.S.C. § 1396a; 42 C.F.R. § 430.10. While many provisions of state plans are mandatory, states may choose from among many optional eligibility categories and services to tailor its Medicaid program to local needs.

Distinct from the optional eligibility categories and services provided through a state plan are so-called Medicaid "waiver" programs. Medicaid waiver programs give states flexibility to adapt services to target populations by waiving a few specified mandatory provisions that apply to services provided through a state plan. One type of waiver program is the Home and Community Based Services (HCBS) waiver. *See* 42 U.S.C. § 1396n(c) (also known as Section 1915(c) of the Social Security Act). The HCBS waiver is designed for states to provide community-based alternatives for individuals who would otherwise require institutionalization in a setting such as a nursing facility. *See id.* The Medicaid state plan requirements that are waived are those of "statewideness" and "comparability," two provisions that are not relevant to the Plaintiff's case. 42 U.S.C. § 1396a(a)(1); 42 U.S.C. § 1396a(a)(10)(B). In addition, the HCBS waiver affords states flexibility in setting income and asset rules for the target population, another provision that is not relevant here. 42 U.S.C. § 1396a(a)(10)(C)(i)(III). The waiver

program does not waive any other requirement of the Medicaid Act, including the fair hearing and notice requirements.

Arkansas has availed itself of the HCBS waiver to institute ARChoices, which, as of January 1, 2016, replaced two similar predecessor HCBS waiver programs, AAPD and ElderChoices, whose main difference was the age of the beneficiary.[1] ARChoices recognizes "an individual's rights of privacy, dignity and respect" and supports "full access of beneficiaries…to the greater community, including opportunities to seek employment and work in competitive integrated settings, engage in community life, control personal resources and receive services in the community." ARChoices Provider Manual § 201.105.[2]

ARChoices provides an array of services for program beneficiaries, including, but not limited to, attendant care services, home-delivered meals, and a personal emergency response system. *Id.* at § 211.000. In addition to the ARChoices-specific services, an ARChoices beneficiary receives the full range of state plan Medicaid services, including personal care services and coverage for mental health services, diagnostic tests, medical and incontinence supplies, and prescription medications. The services at issue in the present suit are attendant and personal care services, both of which provide assistance with activities of daily living. *See* ARChoices Provider Manual § 213.210, Personal Care Provider Manual § 213.210.[3] The central distinction between the two is that attendant care is available solely to people on ARChoices while personal care is available to people on ARChoices and people who are not eligible for

---

[1]AAPD served individuals between ages 21 and 64. ElderChoices served individual 65 and over.

[2] *Available at* https://medicaid.mmis.arkansas.gov/Provider/Docs/archoices.aspx
[3] *Available at* https://medicaid.mmis.arkansas.gov/Provider/Docs/perscare.aspx

ARChoices but are eligible for other kinds of Medicaid. In any situation, personal care is capped at 64 hours per month. Personal Care Provider Manual § 217.000

ADHS imposes functional eligibility criteria to determine if someone is eligible for ARChoices. To meet the functional eligibility criteria, a person between the ages of 21 and 64 must have a physical disability as defined by the Social Security Administration and require an intermediate level of care in a nursing facility. An individual over 65 must only require an intermediate level of care in a nursing facility. ARChoices Provider Manual § 212.000. To meet the level of care criteria, the individual must be unable to perform either (1) at least 1 of the 3 activities of daily living (ADLs) of transferring/locomotion, eating or toileting without extensive assistance from, or total dependence upon another person; or (2) at least 2 of the 3 ADLs of transferring/locomotion, eating, or toileting without limited assistance from another person. *Id.* After determining that someone is eligible, ADHS determines how much care to allocate them.

The process for assessing functional eligibility and determining how much care to allocate individuals has changed significantly in recent years.

## **Assessment under ARChoices**

As stated above, there are criteria to determine whether an applicant requires an "intermediate level of care" necessary for ARChoices eligibility, with the relevant criteria being the ability to perform ADLs. Ark. MS Policy Manual § F-155; ARChoices Provider Manual § 212.000. The ADL criteria have remain essentially unchanged for at least a decade. What has changed, however, is how ADHS assesses the individual's ability to perform the ADLs and the process used to determine how much care to allocate to eligible individuals.

Prior to January 1, 2016, ADHS used an assessment tool called ArPath to assess an individual's eligibility. The agency determined the amount of services to allocate under

ARChoices' predecessor programs according to the professional discretion of a ADHS registered nurse, who could authorize beneficiaries under the age of 65 up to eight hours per day of care and beneficiaries age 65 or over up to seven hours per day of care.

Starting January 1, 2016, while still using the ArPath to assess eligibility, ADHS changed the way it allocated care by switching from the system of nurse discretion to an algorithm-based methodology called RUGs (short for Resource Utilization Groups). Under RUGs, about half of all ARChoices beneficiaries received service reductions. Use of the ArPath and RUGs ended on December 31, 2018.

Starting January 1, 2019, ADHS again changed its system for assessing beneficiary eligibility and for allocating services and began using an assessment tool called Arkansas Independent Assessment (ARIA). *See generally* ARChoices Provider Manual § 212.000(E). A nurse employed by a contracted company called Optum visits an applicant or beneficiary in their home, asks the questions provided by the ARIA assessment tool, and marks a response. The responses to the assessment are run through an algorithm to place the beneficiary into a tier used to determine eligibility. People eligible according to the assessment and algorithm are classified as Tier Two. ADHS's Office of Long-Term Care then reviews the results and decides whether an individual is eligible for ARChoices, sometimes overruling the assessment's tier result.

Eligible individuals then move onto the process for developing an "ARChoices Person-Centered Service Plan" and determining the amount of services ADHS will allocate to them. Starting January 1, 2019, ADHS's introduced a multi-step process to determine the amount of services to allocate an eligible individual

First, ADHS assigns a beneficiary an Individual Service Budget. Generally, ADHS has three Individual Service Budget levels, which allow an ARChoices beneficiary to receive up to

$5,000, $20,000, or $30,000 worth of waiver services per year, respectively. ARChoices Provider Manual § 212.200(D). The budget level assigned depends on results from the ARIA assessment tool. An individual who is rated as needing extensive assistance or total dependence in all three activities of daily living of transferring/locomotion, eating, and toileting is placed at the $30,000 level. *Id.* An individual who is rated as needing extensive assistance or total dependence in two of the three activities of daily living of transferring/locomotion, eating, and toileting is placed at the $20,000 level. *Id.* Any other individual is placed at the $5,000 budget level. *Id.* Additionally, there is a fourth possible budget level limited to individuals who received more than $30,000 worth of waiver services during 2018. *See* ARChoices Provider Manual § 212.200(D)(3). For these select beneficiaries, ADHS authorizes a "Transitional Allowance" budget for 2019 and 2020 that is fixed at the total cost of the person's waiver services for 2018, even if that amount exceeds $30,000. *Id.*

Second, an ADHS registered nurse visits the eligible individual in their home to complete a form called the Task and Hour Standards. The Task and Hour Standards lists 11 activities of daily living (ADLs)—eating, bathing, dressing, grooming, toileting, walking/mobility, transferring/positioning, cleaning, shopping, laundry, and meal preparation. For each ADL, the nurse determines a beneficiary's placement in one of three Needs Intensity levels based on the assistance the person requires and then allots a specific number of minutes from a range authorized for that level. *See* ARChoices Provider Manual § 212.300(D). The nurse then determines the frequency of assistance needed and tabulates the total amount of time to allocate for that ADL. *Id.* After completing this process for all 11 ADLs, the nurse calculates the total monthly amount of medically necessary care hours. *Id.* The Task and Hour Standards does not contain a space for the nurse to allocate travel time to accompany a beneficiary to medical

appointments or community activities, even though ADHS policy provides for such time. *See* ARChoices Provider Manual § 213.220(D)

Third, during the ADHS nurse's home visit, the nurse determines the amount of care hours deemed medically necessary under the Task and Hour Standards that the individual can receive under the assigned Individual Service Budget level. *See generally* ARChoices Provider Manual §§ 212.200, 212.300. Home-delivered meals and the personal emergency response system also count against the budget. ADHS has set the value of each attendant care hour at $18.12, each home-delivered meal at $5.97, and the personal emergency response system at $32.62 per month. Arkansas Medicaid ARChoices Fee Schedule.[4] A person may not receive services costing more than the budget level, even if the ADHS nurse has determined that more care hours or other waiver services are medically necessary. *See* ARChoices Provider Manual § 212.300(D)(6). Conversely, a person cannot receive more care hours or other waiver services than are determined to be medically necessary, even if their budget level is sufficient to afford more services. *See* ARChoices Provider Manual § 212.200(B)(5).

Fourth, at some point after the home visit, the ADHS nurse sends the client a copy of the completed ARChoices Person-Centered Service Plan along with a Notice of Action. This mailing triggers a beneficiary's appeal rights.

ADHS assesses program participants at least once every year to determine their functional eligibility and, if eligible, to develop an updated person-centered service plan. *See* ARChoices Provider Manual § 212.320. Beneficiaries can be subject to re-assessment more than once a year if they experience a change in status or service needs. *See* ARChoices Provider

---

[4] *Available at* https://medicaid.mmis.arkansas.gov/Download/provider/docs/fees/ARCHOICES-fees.pdf

Manual §§ 212.305, 212.500. ADHS has no plans to switch to a different assessment tool, allocation methodology, or notice of action

<u>Legal Standard and Argument</u>

The analysis regarding the grant of a temporary restraining order and a preliminary injunction is well-settled. The court must consider four factors: (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest. *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F. 2d 484, 485-86 (8th Cir. 1993) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). While no single factor is determinative, the probability of success factor is the most significant. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).

Recognizing that "haste…is often necessary" in deciding a request for a preliminary injunction, the U.S. Supreme Court countenances "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981). Importantly, "[a] party is not required to prove his case in full at a preliminary-injunction hearing." *Id.*

    **A.**    **The Plaintiff is likely to succeed on the merits of individual capacity claims asserted because the Defendant's actions clearly violate constitutional due process requirements for adequate notice and continuing benefits pending appeal.**

As stated above, the probability of success is the most significant factor in the preliminary injunction analysis. *Home Instead, Inc*, 721 F.3d at 497. Where a preliminary injunction does not seek to prevent the implementation of a statute, the Plaintiff must demonstrate only a "fair chance" of success on the merits. *See Heartland Acad. Cmty. Church v.*

*Waddle,* 335 F.3d 684, 690 (8th Cir. 2003); *Southeast Ark. Hospice, Inc. v. Burwell*, 2:13-cv-00134-KGB, 2014 U.S. Dist. LEXIS 79485, at *16 (E.D. Ark. 2014). Under the "fair chance" standard, the Plaintiff is not required to prove a mathematical probability of success on the merits; less than a 50 percent probability can still suffice. *Heartland Acad. Cmty. Church,* 335 F.3d at 690. Here, the Plaintiff's claims easily surpass the "fair chance" threshold, as they are firmly rooted in enforceable law and supported by material facts establishing valid claims.

Specifically, the Plaintiff asserts two *official capacity* constitutional due process claims for the Defendants' failure to provide adequate notice about the reduction of her services and continuing benefits pending appeal.

Where an individual has a property interest, the Due Process Clause of the Fourteenth Amendment safeguards the individual's interest against state deprivation. The Supreme Court has established the framework for analyzing property interests:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972). It is well-established that Medicaid recipients have a statutory entitlement to benefits that is protected by the Due Process Clause. *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 787 (1980) (holding Medicaid recipient has right protected by due process to continued Medicaid benefits to pay for services from the qualified provider of his choice). In *Goldberg v. Kelly*, 397 U.S. 254 (1970), the Court noted that termination of welfare benefits for the poor—a category that includes beneficiaries of the Medicaid program—pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits. *Id.* at 264. Here, the Plaintiff has a legitimate claim of entitlement to her ARChoices waiver services at the pre-reduction levels, as

she has been eligible for the program since 2012 and has received 143 monthly hours of care since at least 2017. Dearmore Decl. ¶ 6-7.

Although due process "is flexible and calls for such procedural protections as the particular situation demands," *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976), the requirements for an evidentiary hearing prior to benefit reduction and adequate notice are beyond dispute for the ARChoices Medicaid program.

A Medicaid beneficiary is clearly entitled to continuing benefits pending appeal. *O'Bannon v. Town Court Nursing Ctr*., 447 U.S. 773, 786-87 (1980) ("The Government cannot withdraw these direct [Medicaid] benefits without giving the patients notice and an opportunity for a hearing on the issue of their eligibility for benefits."). State and federal regulations enshrining such due process requirements explicitly provide that ADHS must send a notice of adverse action to a beneficiary at least 10 days before the date the adverse action will take effect and that appeals lodged before the date the adverse action is to take effect guaranteed continuing benefits until the outcome of an evidentiary hearing. 42 C.F.R. §§ 431.211, 431.230, 431.231; ADHS Medicaid Provider Manual § 161.500;[5] Ark. Medical Services Policy J-100, J-110, L-120.[6]

In Ms. Dearmore's case, she appealed within 10 days of the date on the notice of action and nevertheless had her services cut from 143 to 103 monthly care hours. Dearmore Decl. ¶¶ 8, 11, 12. ADHS has no discretion to withhold services in such situations. Therefore, she is likely to prevail on the merits of this due process claim.

---

[5] *Available at* https://medicaid.mmis.arkansas.gov/Provider/Docs/all.aspx

[6] *Available at*
https://humanservices.arkansas.gov/images/uploads/dco/policies/Medical_Services_Policy_Manual.pdf

Moving to the second due process claim, the requirements for adequate notice are similarly established. *Goldberg* held that a recipient must have "timely and adequate notice detailing the reasons for a proposed termination." *Id.* at 267. Guarding against adverse actions "resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases," such notice enables the individual to understand what premises, rules, and policies underlie the government's decision. *Id.* at 268. As the D.C. Circuit Court of Appeals has stated, "unless a person is adequately informed of the reasons for denial…, a hearing serves no purpose and resembles more a scene from Kafka than a constitutional process." *Gray Panthers v. Schweiker*, 652 F.2d 146, 168 (D.C. Cir. 1980). One court, perhaps composed of Kafka fans, colorfully described the Medicaid statutory and regulatory scheme as "among the most completely impenetrable texts within human experience" and "dense reading of the most tortuous kind." *Rehab. Ass'n v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994). Accounting for the likely disadvantages in comprehending Medicaid a beneficiary has relative to an already-befuddled federal judge, the notice must explain the proposed action and reasons for it "in terms comprehensible to the claimant." *Ortiz v. Eichler*, 616 F. Supp. 1046, 1061 (D. Del. 1985), *aff'd*, 794 F.2d 889 (3d Cir. 1986).

Various state and federal statutes and regulations further prescribe the notice's content, including the action to be taken, specific reasons for the action, the right to appeal, how to file an appeal, and how to receive continuing benefits pending the appeal decision. Ark. Code Ann. § 20-77-121; Ark. Medical Services Policy J-100 to 120; 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.201, 431.206, 431.210.

ADHS is particularly adept at ignoring its notice obligations. In *Jacobs v. Gillespie*, 3:16-cv-119-DPM (E.D. Ark. Nov. 1, 2016), Judge Marshall held that ADHS provided deficient

notice to ARChoices beneficiaries under the ArPath assessment and RUGs allocation methodologies in effect at that time. The Court ordered that the notice "be in plain and clear terms," "explain why benefits are being reduced," "explain the benefit reduction with specific references (as applicable) to the beneficiary's" assessment, including related algorithms, and "be as specific as reasonably practicable about the beneficiary's health conditions and reduced benefits." *Id.*, Dkt. 62. While ADHS replaced the ArPath and RUGs starting January 1, 2019, the new system to assess a beneficiary and determine how much care they receive is complex and involves multiple steps involving an assessment by an Optum nurse, an assessment by an ADHS nurse, the determination of an Individual Service Budget, and the completion of a Task and Hour spreadsheet. *See supra* at 7-9. Changing the methodology does not obviate the need for due process. Indeed, the requirements specified in the *Jacobs* order—and the reasoning behind them—are equally applicable to the current methodology.

Judge Marshall's decision is not an outlier. Courts addressing notice requirements for Medicaid home- and community-based services programs consistently demand particularized explanations for adverse actions, particularly when an agency is using complex, multi-step processes like those at issue here. *See, e.g., K. W.*, 789 F.3d 962, 970-74 (9th Cir. 2015) (affirming district court's grant of preliminary injunction on constitutional due process notice grounds where notice of Medicaid waiver services budget reduction "did not specify why individual budgets had decreased"); *Baker v. State*, 191 P.3d 1005, 1008, 2008 Alas. LEXIS 125 (Alaska 2008) (reversing trial court's denial of preliminary injunction on constitutional due process grounds where notice of reduction of Medicaid waiver personal care hours based on assessment tool failed to include the assessment tool or otherwise explain how and why the agency reached the decision to reduce services); *L.S. by & through Ron S. v. Delia*, No. 5:11-

CV-354-FL, 2012 WL 12911052, at *14 (E.D.N.C. Mar. 29, 2012) (granting preliminary injunction on due process grounds to Medicaid waiver beneficiaries whose annual services were being reduced pursuant to an assessment system because beneficiaries "did not understand the score" or "how the score was reached").

Sadly, ADHS does not heed precedent, its own history of wrongdoing, or logic. Ms. Dearmore's notice of action does not identify that any reduction in services has taken place. Dearmore Decl., ¶ 8, Exhibit 2. The pages of the notice, the service plan, the accompanying letter, and the Task and Hour spreadsheet do not anywhere explain reasons for the cut in services. They do not elucidate the criteria that ADHS used to determine why 103 monthly care hours was more appropriate than 143 (or any other number). They do not claim that her functional abilities have improved, specify what such improvement may be, or state the basis for any such belief. By reading the papers, an individual has no idea about what they need to prove in an administrative hearing to contest the cuts. Unsurprisingly, then, Ms. Dearmore declared that "I do not understand why my services were being reduced." *Id.*, ¶ 9. Without such information, Ms. Dearmore has no idea what to prove at a hearing.

The requirements for detailed explanations for ARChoices beneficiaries facing benefit reductions fits squarely within the *Matthews* framework to decide the level of process due. As the complexity of agency decision-making increases, so too does the "risk of an erroneous deprivation." *Mathews*, 424 U.S. at 335. In the case of ARChoices, the factors relevant to a benefit reduction may be in the Optum assessment, a calculation about the Individual Service Budget, a determination by an ADHS nurse of a particular need for help in one or more of the 11 ADLs contained in the Task and Hour spreadsheet, or in the calculations made based on the information in the spreadsheet. Given that the private interest at stake is basic health, safety, and

welfare needed to live outside of an institution, procedural safeguards like detailed notices minimize the chances that a beneficiary will experience unwarranted suffering. If Ms. Dearmore and all other ARChoices understand the specific criteria by which ADHS determines their care hours, they can better support their claim to a sufficient amount of services. Any fiscal or administrative burden on ADHS is inconsequential as it relates to these fundamental constitutional obligations. If ADHS is unable to explain the complicated system it has chosen to the people it serves, then it must either learn to explain the system or move to a simpler system that it can explain.

**B.     The Plaintiff is likely to suffer irreparable harm in the absence of an injunction.**

Irreparable harm is injury for which a monetary award is not adequate compensation. *See Baker Elec. Co-op. v. Chaske,* 28 F.3d 1466, 1473 (8th Cir. 1994). As the Eight Circuit Court of Appeals has held, "the danger to plaintiffs' health…gives them a strong argument of irreparable injury."   *Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003). Consequently, a loss of Medicaid services that harms a plaintiff's health establishes irreparable harm for purposes of a preliminary injunction. *See White v. Martin*, 02-4154-CV-C-NKL, 2002 U.S. Dist. LEXIS 27281, at *11-12 (W.D. Mo. 2002) (medical equipment); *Hiltibran v. Levy,* No. 10-4185-CV-C-NKL, 2010 WL 6825306, at *6 (W.D. Mo. Dec. 27, 2010) (incontinence supplies), *subsequent plaintiff motion for summary judgment granted on same grounds*, 793 F. Supp. 2d 1108, 1115-17 (W.D. Mo. 2011). More specifically, an imminent reduction of personal care services necessary for community-based living constitutes irreparable harm. *See, e.g., K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479, 493 (D. Idaho 2014) ("[A] participant's budget equates to a reduction in services. As a result, many of the named Plaintiffs are at risk of being institutionalized. All of

them, however, risk stagnating or more likely regressing in their functional levels because of the reduced levels of support they can afford with their diminished budgets.").

Ms. Dearmore has already suffered extensively, whether the daily harms of skipping meals and showers and sitting in urine-soaked clothing, new skin problems around her genitals due to lack of time to clean, or the longer-term harms of staying shut in, missing medical appointments, and experiencing increased symptoms of depression. Dearmore Decl. ¶¶ 13-15.

Apart from the health concerns, the failure to provide constitutionally sufficient notice is itself irreparable harm. *Strouchler v. Shah*, 891 F. Supp. 2d 504, 521 (S.D.N.Y. 2012). Without proper notice, the Plaintiff has not been informed of the reasons for the reduction in services, the care allocation system used, or what must be proven to establish her eligibility for the pre-reduction allotment or even increased services. The proximity of the fair hearings, though no present date has been set since the February 12 hearing was continued, and the new assessment amplify the threat of harm. Dearmore Decl. ¶¶ 17-18. She faces the imminent threat of reassessment and having a tribunal decide her rights without any discernible criteria. Upholding the agency's decision would result in the definite reduction of services and all the associated harms while any subsequent appeal process was underway.

**C.    The harm suffered by the Plaintiff outweighs any injury an injunction would inflict on the Defendants.**

In the most basic sense, an injunction preventing the Defendants from reducing the Plaintiff's level of services will cause the Defendant no harm. If anything, such an injunction aids ADHS by encouraging the agency to administer the program according to the requirements of the U.S. Constitution and further the ARChoices program's aim of facilitating community living.

Presumably, the agency will advance some sort of budgetary consideration for the injury an injunction would inflict. However, as the Eighth Circuit has said, "budgetary considerations cannot be the conclusive factor in decisions regarding Medicaid." *Ark. Med. Soc'y v. Reynolds*, 6 F.3d 519, 531 (8th Cir. 1993). Evincing the prime importance of compliance with law over short-term fiscal suitability, the court warned that "the state may not ignore the Medicaid Act's requirements in order to suit budgetary needs." *Id.* Here, the state has ignored constitutional requirements even more fundamental than those of the Medicaid Act. Such overwhelming unlawful action that threatens significant harm to a vulnerable Plaintiff tips the balance against any injury the agency could assert.

**D.      An injunction would serve the public interest by ensuring compliance with foundational constitutional principles.**

The issuance of an injunction would also serve the public interest. The Plaintiff seeks to have the Defendants comply with their legal obligations under the Constitution. Of course, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994). The Plaintiff's own vulnerability heightens the public's interest, as the Defendants' violations amount to *de facto* denial of medically necessary services designed to keep the Plaintiff out of the institutions and in the community, as is the aim of the ARChoices program. Finally, a pattern of severe and intentional violations of due process erodes respect for constitutional mandates.

**E.      The Court should waive the bond due to the Plaintiff's indigence.**

The Plaintiff requests that the injunction be issued without requiring a cash bond under Rule 65. This Court has discretion to issue a preliminary injunction without requiring security. *See Xcentric Ventures, L.L.C. v. Smith*, 2015 U.S. Dist. LEXIS 118143, at *77-78 (N.D. Iowa 2015). Here, the Plaintiff is seeking to enforce the Constitution, and the Defendant will suffer no

monetary loss as a result of the injunction. *See id.; Doctor John's, Incl v. Sioux City*, 305 F.Supp.2d 1022, 1043-1044 (2004) (no bond is required where an injunction would cause no monetary damages).

The Plaintiff's ability to enforce her rights should not be dependent on her ability to pay. She qualifies for ARChoices because she is indigent, and "[p]oor persons . . . are by hypothesis unable to furnish security as contemplated by Rule 65(c)." *Denny v. Health & Soc. Servs. Bd. of State of Wis. Dep't of Health & Soc. Servs.*, 285 F. Supp. 526, 527 (E.D. Wis. 1968). *See also J.L. v. Parham,* 412 F. Supp. 112, 140 (M.D. Ga. 1976) (rev'd on other grounds) (waiving requirement of bond where plaintiffs proceeded *in forma pauperis*).

## <u>Conclusion</u>

For the foregoing reasons, the Plaintiff respectfully requests that the Court issue a temporary restraining order and preliminarily injunction ordering ADHS to (a) immediately increase Ms. Dearmore's ARChoices services to the levels contained in the last service plan in effect prior to November 8, 2019; (b) hold the unscheduled administrative hearing in abeyance pending the resolution of this suit; and (c) refrain from assessing her or determining the amount of services she receives using the system presently in effect until this suit is resolved or she requests an increase in services.

**Dated:** February 27, 2020

Respectfully Submitted,

Kevin De Liban (2012044)
kdeliban@arlegalaid.org
LEGAL AID OF ARKANSAS
310 Mid-Continent Plaza, Suite 420
West Memphis, AR 72301
P: (800) 967-9224 x. 2206
F: (870) 732-6373